UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

R. ALEXANDER ACOSTA,

          Plaintiff,

v.

MIN & KIM INC., d/b/a SEOUL
GARDEN OF ANN ARBOR,
KOUNWOO HUR, and SUNG
HEE KIM,

          Defendants.

_____/

CASE NO. 15-CV-14310
HON. GEORGE CARAM STEEH

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT (Doc. 54), AND DENYING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 55)**

      Plaintiff Secretary of Labor R. Alexander Acosta (the "Secretary")

brought this action under Section 7 of the Fair Labor Standards Act of

1938, ("FLSA"), 29 U.S.C. § 207, against the Korean and Japanese

restaurant known as Seoul Garden located in Ann Arbor, and its owners

Kounwoo Hur and Sung Hee Kim, for unpaid overtime compensation to

their employees.  Now before the court are the parties' cross-motions for

summary judgment.  Oral argument was heard on December 19, 2017 and

informs the court's decision here.  For the reasons set forth below, the

Secretary's motion shall be granted in part and denied in part, and

Defendants' motion shall be denied.

## I. Factual Background

The parties agree that Seoul Garden is covered by the FLSA, and Defendants Hur and Kim are deemed employers under the Act.  Hur and Kim purchased Seoul Garden in 2008.  Hur and Kim claim that at the time of purchase, they saw certain FLSA documents but did not understand them because they were in English.  They also allege that they met with their accountant, Amy Lee, when they purchased the restaurant, who explained to them the requirements of the FLSA regarding employee compensation, including minimum wage and overtime provisions.  Lee is now deceased and was not deposed prior to her death.

Seoul Garden employs cooks, sushi chefs, cooks' helpers, servers, dishwashers, and busboys.  Employees are generally expected to work six days a week for a total of 52 hours.  The restaurant is open from 11:30 a.m. to 10:00 p.m. on weekdays, and from noon until 10:30 p.m. on Saturdays and Sundays.  The restaurant is closed from 2:30 p.m. to 4:30 p.m. Employees generally work both the lunch shift and the dinner shift, arriving one hour before the restaurant opens. They usually take a 30-minute lunch break as well as a 30-minute dinner break, a two-hour break from 2:30 to 4:30 p.m., and then work until the restaurant closes.

In October, 2014, an investigator, Jihong Meng, of the United States Department of Labor, Wage and Hour Division ("Wage and Hour"), reported to the restaurant to conduct an investigation. No employees had complained about the restaurant's pay practices, but the restaurant was selected for investigation as part of the Wage and Hour's enforcement initiative targeting restaurants in Midwest college towns. Defendants suggest that they were singled out, along with seven other restaurants, because they were owned by minorities, and that Meng, as a Chinese American, was biased against them and accused them of doing things, the "Korean way." The Secretary disputes that any racial prejudice influenced the investigation, and points out that the investigation was initiated by management; Meng reported to numerous supervisors, and the case was presented for review to a multitude of Wage and Hour personnel, including the Regional Solicitor's Office.

Prior to and during the investigation, Defendants did not record actual hours worked by their employees but recorded days worked using an "O" and days not worked using an "X." When an employee worked both the lunch and dinner shift, Defendants recorded two "Os." Defendants claim they paid employees for one or two shifts regardless of whether they left early, and that if an employee worked only one shift, Defendants divided

the total hours worked in half. Defendants' pay records during the investigation set forth only the total amount paid by cash or check, and did not record any regular or overtime pay. Defendants failed to record full names and contact information for each employee.

During the investigation, Meng, and two Spanish speaking investigators, interviewed employees and Defendants Hur and Kim. The employees reported that they were paid a flat day rate and were paid the same whether they worked 40 hours a week or if they worked more than that. Also, during their initial interviews during the investigation, Hur and Kim stated that employees were paid on a daily basis.

During Meng's initial conference with Hur and Kim on October 28, 2014, Meng requested time records. Defendants produced only schedules which did not reflect actual hours worked by employees but merely recorded whether an employee was absent, by noting an "X", worked one shift by noting an "O," or worked two shifts by noting an "OO." (Doc. 54-16, Ex. M at ¶ 7). Defendants also provided payroll records for the time period of October 1, 2012 to October 15, 2014, which show only the amount paid, and do not reflect hours worked, regular rate, straight time pay or overtime pay for each work week. *Id.* at ¶ 8.

Beginning in 2016, apparently as a result of the Wage and Hour

investigation, Defendants began using a time clock. Also, beginning in

January of 2017, Defendants entered into written agreements with their

employees setting forth an hourly rate, overtime rate, and "guaranteed

wage" based upon the expectation that the employee work six days a

week. During discovery, Defendants also produced records showing

employees' actual hours worked and pay rates from August 29, 2016 to

March 26, 2017. Defendants have not produced corresponding records for

the period from October 15, 2014 to August 29, 2016. Defendants claim

that despite the lack of contemporaneous documentation, their pay

practices have been consistent from 2013 to 2017. For purposes of his

motion for summary judgment, the Secretary accepts Defendants'

contention that their pay practices have been the same from 2013 to 2017,

and accepts Defendants' most recent pay records as probative evidence of

Defendants' pay practices for the entire time period. The Secretary does

not concede that Defendants actually calculated an amount due based on

an hourly wage, but assumes *arguendo* that Defendants calculated

employees' pay as reflected in the records provided.

Defendants allege that Wage and Hour improperly refused to

consider pay records produced by Lee after the initiation of Wage and

Hour's investigation. Meng met with Lee who provided a reconstruction of

hours worked and hourly rates for a few selected employees to demonstrate that their day rates included overtime. (Doc. 54-16, Ex. M at ¶ 13, 14). In her reconstructions, which Lee entitled "payroll ledgers," Lee calculated the hourly and overtime pay according to an algebraic equation. First, Lee took the weekly pay for an employee and then used the following algebraic equation to arrive at an alleged hourly and overtime rate: weekly salary = x*40 + (x*1.5) *13 where "x" equals the hourly rate. Using this formula, Lee posits that Defendants paid the following hourly sums to its employees Ramiro, Song, and Luis: $8.882, $11.765, and $10.084. The Secretary points out that these hourly rates do not make sense as employers do not generally use figures to the tenth of a percent for an hourly wage.

The Secretary also rejected Lee's alleged "payroll ledgers" because they did not match Hur's pay records. For example, Hur's records show that Jose Martin Fausto was paid $22,371.03 for the period of September 1, 2013 to September 30, 2014, yet Lee's records show he was paid $27,103.66, which amounts to a $5,000 discrepancy which cannot be explained by the slight deviation between semi-monthly pay periods Hur used and weekly pay periods Lee used. (*Cf.* Doc. 54-10 with Doc 55-17) Similarly, Lee's and Hur's records as to Ramiro 2 amounts to a $4,000

discrepancy.  *Id.*  Based on these discrepancies, Wage and Hour declined to credit Lee's "payroll ledgers," where these admitted reconstructions were produced after the initiation of Wage and Hour's investigation, and conflicted with Hur's and Kim's prior representations about how pay was calculated.

The second reconstruction to demonstrate how overtime was included in the day rate was provided by Hur.  His reconstruction involved figures regarding four employees which depicted hours worked, hourly rates, and alleged bonuses paid in addition to the hourly rate and overtime pay.  (Doc. 54-21, Ex. R).  The Secretary also declined to consider the second reconstruction which incorporated deductions and bonuses never mentioned by Hur and Kim in their initial interviews, which conflicted with Lee's reconstruction, and which did not appear on previously produced pay records.  According to Meng, "[i]t appeared to me that Defendants were attempting to "back into" the numbers using different schemes to make it appear as though they were paying overtime."  (Doc. 54-16, Ex. M at ¶ 15).

According to the Defendants, Seoul Garden pays its employees a "guaranteed wage" or a flat rate for each day worked.  Defendants allege that they reached the "guaranteed wage" by negotiating with each employee as to the salary he or she desires, assuming working a six day

week, regardless of the actual hours worked. Defendants then work backwards, calculating an hourly, and overtime rate for work in excess of 40 hours, with each employee, to arrive at the guaranteed rate. Defendants claim they pay each employee based on hours recorded on the time clock at the set hourly rate and overtime rate at one-and-one-half times the set hourly rate. If the amount based on the hourly rate computation is less than the employee's "guaranteed wage," then Defendants promise to pay a bonus to reach the "guaranteed wage." Each pay period, an employee receives twice his "guaranteed wage" payment as long as he or she works 12 days, regardless of his or her actual hours worked. As a result of this system, the bonus increases when an employee works less hours, and decreases when an employee works more hours. In some cases, a negative bonus was calculated. If an employee works less than 12 days, Defendants subtract a flat day rate, calculated by dividing the guaranteed rate by 12, to arrive at the amount due.

Based on the investigation's findings and discovery, the Secretary alleges that Defendants owe $112,212.85 in unpaid overtime for the period of September 11, 2013 through March 26, 2017. (Doc. 54-16, Ex. M at ¶ 20). To arrive at her figure for back wages owing, the Secretary used the total amount paid each pay period, divided by the total hours worked, to

determine the regular hourly rate. Defendants argue this method is flawed because it used an inconsistent hourly rate with the rate varying by as much as $4.00 per week for some employees. Defendants also argue the method is flawed because calculating the regular rate this way led to a very high hourly late that far exceeded the prevailing wage rate for restaurant positions in Ann Arbor as set by the Department of Labor. For example, the Secretary calculated a cook's hourly rate as high as $17.00 per hour, yet the prevailing wage rate set by the Department of Labor is $7.25 per hour. (Doc. 55-5, Ex. 4 at 58, PgID 1447). The Secretary then calculated the overtime pay as one-and-a-half times the regular rate multiplied by the overtime hours. The Secretary calculated wages for these dates based on Defendants' agreement to toll the statute of limitations from September 11, 2015 through December 11, 2015. Because the Secretary seeks damages within the two-year statute of limitations period for FLSA violations, the Secretary need not show "willfulness" as required to extend the statute of limitations period to three years.

In addition, although Defendants claim some employees were paid generously, this is not true of all their employees. For example, cook's helper, Jose Ramiro Garcia Flores, and busboy Jose Neris Garcia-Flores, were paid less than minimum wage for 52 hours of work per week in 2013

to 2014. (Doc. 54-10, Ex. I). In their response brief, Defendants argue that the Secretary's own chart set forth in its response brief (Doc. 71 at PgID 2364) establishes that all of its employees were paid above minimum wage. However, the chart Defendants refer to is a summary based on the January 2017 employment contracts. The Secretary refers to the time period of 2013 to 2014 for the claim that Defendants paid some employees less than minimum wage. (Doc. 75 at PgID 2918).

The Secretary previously filed a motion to amend to add eleven additional employees. The court granted the motion, reopened discovery, and allowed the parties to file supplemental briefs regarding these employees. Defendants filed a supplemental brief (Doc. 79) but the Secretary did not. In their supplemental brief, Defendants rely on the same methodology to explain their pay practices, namely that they agreed upon an hourly rate, overtime rate, "guaranteed wage," and "bonus to match" for those eleven employees. Defendants have attached spread sheets as to the eleven additional employees to this effect. In their supplemental brief, Defendants discuss two employees: Luis Alonso Aguinaga, and Tesus Gonzalo Aguinaga, both of whom were previously discussed in the Secretary's motion for summary judgment. Specifically, the Secretary determined that Tesus Gonzalo Aguinaga is owed $2,218.80 in back

wages, (Doc. 54-25, Ex. V PgID 1237) and that Luis Alonso Aguinaga is owed $1,583.76 in back wages. *Id.* Given that these employees were previously discussed in the Secretary's original motion, it appears that the Secretary was in error when he sought to add these employees mistakenly believed to be previously unidentified. In any event, given that the Secretary did not file a supplemental brief, the court does not address those eleven employees to the extent they were not previously discussed in prior filings. The court has considered the pay records submitted by Defendants in connection with the supplemental brief, and finds that they reiterate the same methodology previously presented to the court in support of Defendants' motion for summary judgment and in response to the Secretary's motion. Thus, the court relies on its discussion of Defendants' pay records in connection with the parties' original summary judgment motions below, without specific reference to the supplemental records.

## II. Standard of Law

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original);

*see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

### III. Analysis

Defendants are correct that they paid some of their employees quite well, but this cannot save Defendants from their responsibility to maintain adequate records under the FLSA, and to pay overtime for work in excess of 40 hours per week. The method Defendants used to pay their employees violates the FLSA because they used a "guaranteed wage" that does not account for actual hours worked, and did not pay overtime at one

and one-half times the employees' "regular rate."

A.    <u>Overtime Violations</u>

Defendants violated the FLSA by failing to compute each employee's regular rate on a workweek by workweek basis for purposes of calculating overtime.  The FLSA prohibits an employer from employing a non-exempt employee for more than 40 hours per week, unless the employee is compensated at time and a half times the hours worked at the regular rate in excess of 40 hours.  29 U.S.C. § 207(a)(1).

Defendants argue that they can agree on a "regular rate" at any amount they desire, as long as the rate is in excess of the minimum wage, and that because they paid their employees in excess of the minimum wage, they are not in violation of the FLSA.  In support of this argument, they rely on *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945).  *Youngerman* fails to support Defendants here.  In that case, longshoreman were guaranteed a set hourly rate and overtime rate, or an "incentive" rate based on actual work completed on a piecemeal basis, whichever was greater.  *Id.*  Based on the way the work was performed, the "incentive" rate was always triggered; thus, the workers were always paid the "incentive" rate which amounted to some $.59 per hour, which was higher than the contractual overtime rate of $.52 per hour.

*Id.* at 425.  Accordingly, in determining the "regular rate" for purposes of calculating overtime due, the Supreme Court used the "incentive rate," not the agreed upon hourly and overtime rate, ruling that it must consider the economic realities of how the longshoreman were paid in determining FLSA compliance.  *Id.*  As a result, the longshoreman were all entitled to overtime pay beyond the amount they had agreed upon based on the realities of how they were actually paid.  The Supreme Court found that the "incentive" rate violated the FLSA because the "regular rate" should have been calculated by dividing the number of hours worked by the total "incentive" rate and basing overtime as time and a half the "regular rate."  *Id.*

Similarly, Defendants here cannot rely on the hourly and overtime rate allegedly agreed upon with their employees, because the court must consider how the employees were actually paid.  It is undisputed that the "guaranteed wage" for Defendants' employees usually exceeded the amount agreed upon for hourly and overtime pay based on the addition of the so called "bonus to match."   For reasons discussed more fully later in this opinion, the FLSA and its accompanying regulations require that the "bonus to match" must be included in the "total remuneration" in calculating the "regular rate."  29 C.F.R. § 778.109; 778.208.  Contrary to Defendants'

argument, it is simply not true that an employer satisfies the dictates of the FLSA merely by paying its employees minimum wage. The Supreme Court has recognized that the FLSA does not merely guarantee a worker that she or he will paid at the minimum wage, but the FLSA guarantees that a worker shall be paid overtime even where his or her wages exceed the minimum wage. *Bay Ridge Oper. Co. v. Aaron*, 334 U.S. 446, 460 (1948).

Defendants are incorrect that their "guaranteed wage" amounted to a "regular rate." The term "regular rate" is governed by statute and is defined to "include all remuneration for employment paid to . . . the employee." 29 U.S.C. § 207(e). There are eight statutory exceptions to the rule that all remuneration must be considered in determining the "regular rate," 29 U.S.C. § 207(e)(1)-(8), but Defendants have not argued that any of the exceptions apply here. [1] Indeed, the exceptions "are to be interpreted narrowly against the employer, and the employer bears the burden of showing that an exception applies." *Newman v. Advanced Tech. Innovation Corp.*, 749 F.3d 33, 36 (1st Cir. 2014) (citation and internal

---

[1] The FLSA expressly provides that overtime premiums need not be considered in determining the "regular rate," 29 U.S.C. § 207(e)(5), else employers would be required to pay overtime on top of overtime; however, Defendants have not argued this exception applies nor could they as they have not shown that they paid extra compensation for hours worked in excess of eight in a day or in excess of the maximum workweek, rather they paid a flat rate regardless of hours worked.

quotation marks omitted).  The "regular rate" is an hourly rate, and is calculated by dividing "all remuneration for employment" (except statutory exclusions) paid to the employee by total hours worked.  29 C.F.R. § 778.109.  Where the parties agree on a weekly wage inclusive of regular and overtime compensation, the "regular rate" of pay is calculated by dividing an employee's weekly salary by the number of scheduled hours worked and his or her overtime compensation is assessed at time and a half his or her regular rate.  *See Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 330 (3d Cir. 2016); *Chavez v. City of Albuquerque*, 630 F.3d 1300, 1312 (10th Cir. 2011); *Mumbower v. Callicott*, 526 F.2d 1183, 1187 (8th Cir. 1975) (citing *149 Madison Ave. Corp. v. Asselta*, 331 U.S. 199, 204 (1947)).  The regulations provide that an employee's "regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked."  29 C.F.R. § 778.112.  The regular rate includes an employee's "total remuneration" and includes bonuses.  29 U.S.C. § 207(e); 29 C.F.R. § 778.109; 778.208. The employee is then entitled to "extra half-time pay at this rate for all hours worked in excess of 40 in the workweek."  29 U.S.C. § 207(a).

Although the FLSA does not require employers to compensate their employees on an hourly basis, "the overtime compensation due to

employees must be computed on the basis of the hourly rate derived therefrom, and therefore, it is necessary to compute the regular hourly rate of such employees during each workweek."  29 C.F.R. § 778.109.  The "regular rate" will necessarily fluctuate when an employee's hours vary.  29 C.F.R. § 778.108.  In this case, Defendants paid their employees a flat day rate, regardless of the hours worked.  The Secretary calculated overtime due by performing a mathematical computation to determine the "regular rate."  The Secretary used the total remuneration as the dividend, and the hours worked as the divisor, to determine the "regular rate" as the quotient. Using this calculation, the Secretary determined that Defendants failed to pay overtime at one and a half times the regular rate for any of their employees.  Defendants have failed to show that the Secretary's calculations do not comport with the strictures of the FLSA.  Accordingly, Defendants' pay practices violate the FLSA's requirement for overtime compensation under 29 U.S.C. § 207(a) and the Secretary is entitled to summary judgment.

B.    Defendants Failed to Comply with Section 7(g)(3)

Defendants argue that they complied with Section 7(g)(3) of the FLSA which provides an exception from the general rules regarding overtime compensation, and allow employers to pay their employees a "basic" rate

of pay in certain circumstances.  Specifically, 29 U.S.C. § 207(g)(3)

provides:

> No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under such subsection if, pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work, the amount paid to the employee for the number of hours worked by him in such workweek in excess of the maximum workweek applicable to such employee under such subsection-- . . .
>
> **(3)** is computed at a rate not less than one and one-half times the rate established by such agreement or understanding as the basic rate to be used in computing overtime compensation thereunder: *Provided*, That the rate so established shall be authorized by regulation by the Administrator as being substantially equivalent to the average hourly earnings of the employee, exclusive of overtime premiums, in the particular work over a representative period of time;
>
> and if (i) the employee's average hourly earnings for the workweek exclusive of payments described in paragraphs (1) through (7) of subsection (e) are not less than the minimum hourly rate required by applicable law, and (ii) extra overtime compensation is properly computed and paid on other forms of additional pay required to be included in computing the regular rate.

29 U.S.C. § 207(g)(3).  The Secretary responds that Defendants failed to

comply with Section 7(g)(3) because (1) contemporaneous records do not

support the exception, (2) the overtime compensation did not include the

non-discretionary bonuses, (3) employees pay fluctuated based on days worked not hours, (4) employee's basic wage cannot be less than minimum wage, and (5) the rate is not authorized by the regulations.  The court considers each argument in turn.

1.  <u>Contemporaneous Records Do Not Support Exception</u>

First, during the Wage and Hour investigation, Defendants failed to provide any rates, basic or otherwise, for its employees, but used the "Xs" and "Os" method described earlier and a flat day rate for each employee. Thus, during the investigation, there is no contemporaneous proof that Defendants used the "basic" rate allowed by Section 7(g).  Defendants have not submitted any proof that they reached an agreement with any of their employees regarding the use of such a rate until January, 2017. Beginning at that time, Defendants now have employment contracts with each of their employees agreeing on an hourly rate, an overtime rate, a guaranteed wage rate assuming six days worked per week, and a "bonus to match."  The "guaranteed wage" is promised regardless of hours worked, and is to be reached by addition of a "bonus" where hours worked are insufficient to reach the "guaranteed wage."  (Doc. 55-19).  For the reasons discussed below, even those agreements are infirm.

Defendants rely on spread sheets created by their accountant Lee

purporting to show that they did in fact pay overtime and used a "basic" rate. Those records are deficient because they were not created contemporaneously, but were created by Lee in response to the Wage and Hour investigation. A review of those documents leads to the conclusion that they are not persuasive evidence of FLSA compliance. These records report than an employee's hourly wage to the tenth of a percent. For example, in her first reconstruction of pay records, Lee reports that the hourly rate of some employees was $8.882 or $7.951. (Doc. 54-20, 21, Ex. Q and R). In a later reconstruction of how employees were paid, Lee asserts that in addition to an hourly and overtime rate, employees were paid a "bonus to match" in order to supplement their pay in order to reach the "guaranteed wage." (Doc. 54-21, Ex. R). These records created long after employees were paid, do not support Defendants' claim that they complied with the FLSA. The calculations of hourly pay to the tenth of a percent, and the existence of the so called "bonus to match," are pay methods which neither the employer nor employees mentioned nor supported during the investigation period. These reconstructed attempts to show compliance with the FLSA fail as the FLSA does not allow this sort of non-contemporaneous record keeping. Also, as the Secretary argues, Defendants are trying to fit their square peg of record keeping into the

round peg required by Section 7(g) to no avail.

Although it is possible that Defendants might have paid employees the same wages had they complied with the FLSA recordkeeping and overtime requirements, this does not excuse them from FLSA non-compliance here. In *Dole v. Trusty*, 707 F. Supp. 1074 (W.D. Ark. 1989), for example, after the Department of Labor began an investigation of an employer's method of paying its truck drivers the same flat rate regardless of the time involved in the route. *Id.* at 1075-76. The employer responded to the investigation by adopting two alternative methods of determining pay: (1) it calculated a variable hourly rate depending on how long the trip took after the fact, or (2) it used a fixed hourly rate but a variable bonus. Under either method, the employer paid its truckers the exact same amount that it had paid under its original flat rate compensation system. *Id.* at 1077. The district court found that the methods used violated the FLSA, but noted that nothing prevented the employer, through trial and error, from finding an hourly rate that approximated the result of the trip-rate arrangement. *Id.* The court recognized that the employer could reach the same result through compliance with the FLSA, as through the schemes it devised, but stressed that employers must comply with the methods chosen by Congress and the Secretary of choosing an hourly rate in advance and

change it only prospectively. *Id.*

The same situation exists here. It is possible that Defendants could pay their employees the same amounts if they selected an hourly rate and paid overtime compensation as required by the FLSA, as they did with their system of paying a "guaranteed wage," but what matters is not just the end result, but the methodology used. The reason for compliance is to ensure that employees are indeed paid overtime. Without adhering to the system required by the FLSA, employees lose the protection of that statute and have no way of proving that they are entitled to overtime pay. The Supreme Court has held that "when employers violate their statutory duty to keep proper records, and employees thereby have no way to establish the time spent doing uncompensated work, the remedial nature of [the FLSA] and the great public policy which it embodies" cannot be vindicated. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016) (citation and internal quotation marks omitted); *see also Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165, 173 (1989) ("The broad remedial goal of the statute should be enforced to the full extent of its terms").

The Supreme Court has recognized that "[t]he legislative history of the Fair Labor Standards Act shows an intent on the part of Congress to protect certain groups of the population from substandard wages and

excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce. The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706–07 (1945).  Given the important policy reasons behind the FLSA to protect employees from the requirement of working excessive hours without adequate compensation, Defendants' method of paying a flat day rate to its employees violates the FLSA.

2.    Employment Contracts After January, 2017

Second, it is undisputed that Defendants can show no agreements with their employees prior to January, 2017 to pay them a set hourly rate, overtime, and a "bonus to match" to reach the "guaranteed wage."  In the absence of such an agreement, Defendants cannot rely on Section 7(g) to avoid their obligations under the FLSA for all payments prior to January, 2017.

The court next considers whether Defendants are in compliance with Section 7(g) as of January, 2017 when Defendants entered into

employment contracts with their employees setting forth an hourly rate, overtime rate, "guaranteed wage," and "bonus to match," and finds that they are not. The "bonus to match" is the amount Defendants pay in excess of the hourly pay in order to meet the "guaranteed wage."  For example, Defendants promised employee Park that he would be paid $2,400 per bi-weekly pay period.  Based on an hourly rate of $17.00 per hour, he was owed $2,308.17, and after deducting $129 for rent, would have been paid $2,179.175.  However, because he was promised $2,400, Defendants paid him a "bonus to match" of $220.825.  The oddity of using dollar figures to the tenth of a percent is indicative of the non-compliant nature of Defendants' calculations.  Defendants continue to pay a day-rate and have devised an accounting scheme to suggest they are paying an hourly rate and overtime compensation.

Although Defendants can show an agreement with their employees to pay a "basic rate" after January, 2017, the agreements still fail to satisfy Section 7(g) because that provision of the FLSA requires that the overtime also be paid on "other forms of additional pay" which in this case would include the "bonus to match."  29 C.F.R. §§ 778.108, 778.208.  In other words, the bonus needs to be included in the day-rate compensation for which overtime pay would be based.  *See* 29 C.F.R. § 778.110(b).  Section

778.110(b) explains how the bonus must be included in determining the regular rate, such that an employee is due overtime compensation on any bonus paid in addition to his or her hourly earnings:

> (b) Hourly rate and bonus. If the employee receives, in addition to the earnings computed at the $12 hourly rate, a production bonus of $46 for the week, the regular hourly rate of pay is $13 an hour (46 hours at $12 yields $552; the addition of the $46 bonus makes a total of $598; this total divided by 46 hours yields a regular rate of $13). The employee is then entitled to be paid a total wage of $637 for 46 hours (46 hours at $13 plus 6 hours at $6.50, or 40 hours at $13 plus 6 hours at $19.50).

29 C.F.R. § 778.110.

Even if the "bonus to match" is considered a true bonus, because it is non-discretionary, it must be included when computing the regular rate for overtime purposes. *See* 29 C.F.R. §§ 778.209(a), 778.211(b). Given the requirement that bonuses be included in compensation for purposes of determining the "regular rate," Defendants cannot rely on their "bonus to match" method of calculating pay to circumvent the requirements of the FLSA.

An examination of the so called "bonuses" supports a finding that Defendants' use of them is not compliant with the FLSA. The "bonuses" are different each week, becoming smaller the more an employee works, in some cases actually becoming negative numbers. (Doc 79-3 at PgID 2955,

2962 (Kim and Kimbely)).  The regulations prohibit such "bonuses," which become smaller the more an employee works, as this method of payment is inconsistent with an employer's obligation to pay overtime for hours worked in excess of 40 hours per week.  29 C.F.R. § 778.502(b). Department of Labor regulations provide "[t]he general rule may be stated that wherever the employee is guaranteed a fixed or determinable sum as his wages each week, no part of this sum is a true bonus and the rules for determining overtime due on bonuses do not apply."  29 C.F.R. § 778.502(e).  The regulations provide that an employer cannot use a "bonus" to justify paying an employee a lower hourly rate upon which overtime compensation is based; rather, all of the compensation paid should be used to determine the "regular" rate of pay.[2]

---

[2]29 C.F.R. § 778.500(a) provides:

> Since the term regular rate is defined to include all remuneration for employment (except statutory exclusions) whether derived from hourly rates, piece rates, production bonuses or other sources, the overtime provisions of the act cannot be avoided by setting an artificially low hourly rate upon which overtime pay is to be based and making up the additional compensation due to employees by other means. The established hourly rate is the "regular rate" to an employee only if the hourly earnings are the sole source of his compensation. Payment for overtime on the basis of an artificial "regular" rate will not result in compliance with the overtime provisions of the Act.

3. Employee Pay Fluctuated Based on Days Worked not Hours

Third, Defendants cannot shield themselves for violations of the FLSA record keeping and overtime pay requirements under Section 7(g) because employee pay fluctuated based on days worked, not hours worked.

4. Employee's Basic Wage Cannot Be Less Than Minimum Wage

In addition, Defendants cannot rely on Section 7(g) to excuse their non-compliance with the FLSA as to servers as Defendants paid their servers less than minimum wage. (Doc. 54-15, Exhibit L).

5. The Rate Is Not Authorized By the Regulations

Finally, Defendants cannot rely on Section 7(g) to argue that their "guaranteed wage" method complied with the FLSA. 29 U.S.C. § 548.2(e) requires that the "basic rate" be approved by the Administrator, which admittedly it was not, or fall within one of the enumerated authorized rates under 29 C.F.R. § 548.3, which it did not either. The Secretary posits that only § 548.3(a) could arguably apply, but is does not because Defendants did not pay a true salary, and did not compute the "basic" rate by dividing the salary by the total hours worked.

C.   Injunctive Relief for Record Keeping

The FLSA requires employers to keep records documenting the hours that each employee works daily and weekly, regular hourly rate of pay for any workweek in which overtime compensation is due, as well as their names and addresses. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2(a)(1). The Secretary requests an injunction requiring Defendants to comply with the FLSA's record keeping requirements. *See* 29 U.S.C. § 217 (giving trial courts discretion to enjoin FLSA violations). The issuance of an injunction under the FLSA is within the reasonable discretion of the trial court. *Perez v. Howes*, 7 F. Supp. 3d 715, 727 (W.D. Mich. 2014) (citing *Martin v. Funtime,* 963 F.2d 110, 114 (6th Cir. 1992), *aff'd sub nom. Perez v. D. Howes, LLC*, 790 F.3d 681 (6th Cir. 2015). "The imposition of an injunction is not punitive, nor does it impose a hardship on the employer since it requires him to do what the Act requires anyway—to comply with the law." *Id.* (quoting *Martin*, 963 F.3d at 114). "In determining whether to issue an injunction, the central issue is whether the violations are likely to reoccur." *Id.* "A dependable, bona fide intent to comply, or good faith coupled with extraordinary efforts to prevent recurrence weigh against granting an injunction, while an employer's pattern of repetitive violations or a finding of bad faith are factors weighing heavily in favor of granting a prospective

injunction." *Id.* (internal quotation marks and citations omitted). Thus, in exercising its discretion, a court should consider: "(1) the previous conduct of the employer; (2) the current conduct of the employer; and (3) the dependability of the employer's promises for future compliance." *Id.* (quoting *Reich v. Petroleum Sales, Inc.,* 30 F.3d 654, 657 (6th Cir. 1994)).

Prior to and during the Wage and Hour investigation, Defendants failed to record hourly rates, overtime premium paid, or actual hours worked for the majority of their employees. The post-hoc reconstructions by Lee do not evidence compliance with the FLSA.

Defendants' argument that their employees worked a fixed schedule and thus the method of recording an "x" for a day worked, and an "o" for a date not worked satisfies FLSA record keeping requirements, lacks merit for two reasons. First, 29 C.F.R. § 516.2(c) allows an employer to keep track of the daily and weekly hours an employee normally works, and then an employee may indicate by a check mark or otherwise that such hours were actually worked. But here, Defendants failed to keep a record of the daily and weekly hours an employee usually works. Defendants argue that employees worked set shifts, normally employees work 52 hours per week for six days a week, but Hur testified at his deposition that hours vary by position. (Hur Transcript at 14:6-12) (Doc. 72-2 at PgID 2439). Second,

29 C.F.R. § 516.2(c) requires that if an employee works more or less than the scheduled hours, the employer must show the "exact number of hours worked each day and each week." Defendants failed to do so. The first set of pay records Defendants provided lacked full names and addresses for employees, and for most employees omits hourly rates. The second set of records produced were reconstructions by Lee created after the Wage and Hour investigation. Thus, Defendants failed to comply with the FLSA during the investigation.

Defendants argue even if their past record keeping methods were defective, they are now in compliance with the FLSA's record keeping requirements, and the request for injunctive relief is now moot. The Secretary responds that Defendants' pay practices are still in violation of the FLSA because Defendants are still paying their employees a flat rate, whether as a one-day rate or an hourly rate plus bonus. Given that Defendants' pay practices have been and continue to be non-compliant with the strictures of the FLSA, the Secretary is entitled to injunctive relief.

D.    Liquidated Damages

The Secretary seeks liquidated damages in the amount of double the back wages awarded. Section 216(b) of the FLSA provides that "[a]ny employer who violates the provisions of section 206 or section 207 of this

title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Liquidated damages under the FLSA "are compensation, not a penalty or punishment." *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (internal quotation marks and citations omitted). Because liquidated damages are deemed compensatory, not punitive, they are generally awarded in FLSA actions where back wages are awarded. *Solis v. Min Fang Yang*, 345 F. App'x 35, 38 (6th Cir. 2009). However, in its discretion, the district court may decline to award such damages where the employer shows that it acted in good faith and had reasonable grounds for believing that its act or omission complied with the FLSA. *Id.* (citing 29 U.S.C. § 260).

In this case, Defendants made a good faith effort to comply with the FLSA and its regulations. They relied on the advice of their accountant, Lee. After the Wage and Hour investigation and during the pendency of this lawsuit, Defendants relied on the advice of their counsel in continuing to pay a "guaranteed wage" to their employees. Many, though not all, of their employees were compensated generously. Although Defendants failed to keep adequate and contemporaneous employee time records, or

to comply with the FLSA's requirements for paying overtime, they paid many employees handsomely and records created after the fact suggest that for many employees, the weekly wage they received meant that it was possible that they were paid an hourly rate at or above minimum wage and time and a half for hours in excess of 40 hours per week. In fact, no employees complained about the wages they were paid. Given this reality, it would be unfair to award liquidated damages in these circumstances. Accordingly, the Secretary's request for liquidated damages is DENIED.

## IV. Conclusion

For the reasons set forth above, the Secretary's motion for summary judgment (Doc. 54) is GRANTED in part in that unpaid overtime compensation in the amount of $112,212.85 is awarded, and Defendants' are enjoined from violating the FLSA in the future, and is DENIED IN PART in that liquidated damages are not awarded. Defendants' motion for summary judgment (Doc. 55) is DENIED.

**IT IS SO ORDERED.**

Dated: January 22, 2018

                            s/George Caram Steeh
                            GEORGE CARAM STEEH
                            UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
January 22, 2018, by electronic and/or ordinary mail.


s/Marcia Beauchemin
Deputy Clerk